Paul VANDAVEER, Appellant,

v.

REINHART AND DONOVAN CONSTRUC-
TION COMPANY and Traders and General
Insurance Company, Respondents.

No. 8173.

Springfield Court of Appeals.

Missouri.

Aug. 13, 1963.

Thurman, Nixon & Smith, Hillsboro, Roy W. McGhee, Jr., Piedmont, for appellant.

Edgar S. Carroll, Kansas City, for respondents, Popham, Thompson, Popham, Trusty & Conway, Kansas City, of counsel.

STONE, Judge.

As the result of being thrown from a runaway truck and then being pinned thereunder when it overturned, Paul Vandaveer (hereinafter called the claimant), then forty-five years of age, suffered severe injuries in an accident on October 14, 1952, which arose out of and in the course of his employment by Reinhart and Donovan Construction Company (hereinafter called the employer). By its final award of June 6, 1957, the Industrial Commission of Missouri (hereinafter called the Commission) found that claimant had sustained permanent total disability, awarded him compensation at the then maximum rate of $30 per week for three hundred weeks and "thereafter a pension of $12.69 per week [that being 25% of claimant's average weekly wage of $50.77] for life" [see Sec. 287.200, RSMo 1949, as amended Laws of 1951, p. 623], and ordered the employer and its insurer, Traders and General Insurance Company, to furnish claimant with such physical rehabilitation and medical care as reasonably might be required in the future. There was no appeal from the final award, and the employer and its insurer complied therewith until May 10, 1961, when they filed with the Commission their application for rehearing on the ground of a change in condition. V.A. M.S. Sec. 287.470. Finding that there had been such change in condition, the Commission handed down its award of March 16,

1962 (hereinafter referred to as the award on rehearing), directing that the benefits for permanent total disability payable under the final award of June 6, 1957, should "cease and abate as of December 13, 1961 [the date of the rehearing] * * * subject, however, to the right of [claimant] under the provisions of Section 287.470, RSMo 1959, to have the case reconsidered at some subsequent date." From the award on rehearing, claimant appealed to the Circuit Court of Reynolds County; and, from the judgment of affirmance in the circuit court, claimant appeals to us.

The sole issue in this, as in all proceedings of this character under V.A.M.S. Sec. 287.470, was whether "there had been a substantial change in [claimant's] condition" between the date of the final award and the date of rehearing (in this case between June 6, 1957, and December 13, 1961). State ex rel. Sei v. Haid, 332 Mo. 1061, 1071, 61 S.W.2d 950, 954. Although on judicial review the circuit court was in the first instance, and this court is on appeal, authorized to determine whether, upon the entire record, the Commission reasonably could have made the findings and award under consideration (in which the sole issue as to change in condition was resolved against claimant), this does not mean that either court should substitute its own judgment on the evidence for that of the Commission; but, on the contrary, a reviewing court may set aside the findings and award of the Commission only if they are clearly contrary to the overwhelming weight of the evidence, when the evidence in its entirety, including all legitimate inferences reasonably deducible therefrom, is viewed in the light most favorable to such findings and award. Hogue v. Wurdack, Mo., 316 S.W. 2d 523, 526; Barton v. Western Fireproofing Co., Mo.App., 326 S.W.2d 344, 345(1); Hance v. Johnson, Stephens & Shinkle Shoe Co., Mo.App., 306 S.W.2d 80, 83(5–7). Our statement of facts accords appropriate and required recognition to that basic principle. Heaton v. Ferrell, Mo.App., 325 S.W.2d 800, 802; Slider v. Brown Shoe Co., Mo.

App., 308 S.W.2d 306, 307; Davis v. McKinney, Mo.App., 303 S.W.2d 189, 190.

No appeal having been taken by the employer and insurer from the final award of June 6, 1957, in which the Commission found that claimant had sustained permanent total disability and awarded compensation therefor, that award became conclusive as to all matters adjudicated thereby, including the then nature and extent of claimant's disability. Adkins v. Bramhall, Mo.App., 233 S.W.2d 36, 41(3); Spradling v. Wackman Welded Ware Co., 239 Mo. App. 1195, 1198, 205 S.W.2d 290, 291(1); Winschel v. Stix, Baer & Fuller Dry Goods Co., Mo.App., 77 S.W.2d 488, 491(1). For that reason eschewing the useless task of laboriously detailing the voluminous evidence received by the Commission at hearings prior to June 6, 1957, a few brief observations concerning claimant's injuries and the course of medical treatment will suffice for the purposes of this opinion.

Claimant's principal injuries were (1) a central fracture dislocation of the right acetabulum with displacement of the head of the femur into the pelvis and an associated comminuted pelvic fracture, (2) a fractured left ankle, (3) a comminuted fracture of the upper end of the right humerus, and (4) *perhaps* a fractured fifth lumbar vertebra. Following the accident on October 14, 1952, claimant was hospitalized for forty-three days at Ironton, Missouri, under the care of Dr. R. E. Harland, a general practitioner. In August 1953 claimant was referred to Dr. Robert M. O'Brien, an orthopedic surgeon in St. Louis. Being of the opinion that claimant's injured right shoulder and left ankle would improve with the passage of time, Dr. O'Brien then recommended no special treatment for those areas; but, the right hip fracture dislocation having so deformed the hip joint that the doctor anticipated that it would become worse rather than improve, he recommended "an operative arthrodesis or fusion of the right hip joint which would result in a stiff but painless right hip." In connection with that op-

eration, claimant was hospitalized in St. Louis from November 30, 1953, to March 12, 1954, on which latter date he was discharged on crutches. Although the operation did not accomplish the intended result in that the hip joint did not fuse, Dr. O'Brien thought that claimant had "a fairly good function" considering the damage done to the hip. By November 1954, claimant reported that "his right hip pain was markedly improved" and that his left heel then bothered him more than his right hip. During another period of hospitalization in St. Louis from February 25 to March 21, 1955, a triple arthrodesis involving three fusions in the left foot and ankle was performed. At the last hearing before the final award of June 6, 1957, claimant told of his unsuccessful efforts to obtain employment and of his inability to work.

At the rehearing on December 13, 1961, it was shown that claimant had been employed as a "hospital attendant I" by the St. Louis State School and Hospital (hereinafter called the hospital), a state institution for mentally retarded and epileptics, continuously from October 26, 1959, to the date of rehearing. During that period of more than twenty-five months, claimant had missed fourteen days from work, only six of which had been prior to the filing of employer's-insurer's application for rehearing. His starting salary of $196 per month had, by the time of rehearing, been raised to $238 per month, which was in excess of his stipulated average earnings of approximately $220 per month at the time of accident. His regular work week consisted of five eight-hour days.

The hospital is a major state institution administered under the Division of Mental Diseases. There are nine patient buildings, each having "three dormitories." Although witness Ball, the director of nurses, characterized the patients as "basically mentally retarded," they also include "the very physically deformed, spastics, hydrocephalics, microcephalics, up to the almost normal." In age, the patients range from "80 years old * * * all the way down."

Employment at the hospital is "under the merit system." Each applicant for the position of hospital attendant is given an oral interview and a written examination. The grades are sent to Jefferson City where acceptable applicants are placed on a register, from which the hospital fills all vacancies. The uncontradicted evidence upon rehearing was that claimant had been "regularly hired * * * as other employees there in the hospital."

At the month-end prior to rehearing 28 male and 108 female hospital attendants were employed. Witness Ball pointed out that, as the categories of patients vary from building to building, so does the difficulty of the duties to be performed by the attendants. Generally speaking, those duties "consist of bathing and feeding and dressing the patients" and "light housekeeping duties * * * light sweeping and mopping, dishwashing, serving food and other duties delegated." Witness Young, a supervisor, added "escorting patients to and from school or other places" and supervising children at play. And, when necessary to restrain, lift or carry a patient, attendants in such numbers as may be needed at the time perform those duties.

Each attendant works "in his own area" with "his own duties to perform." However, each gets some help from patients—"part of their stay in the [hospital] is training and learning how to do different things," and an attendant who finishes his own work may help another—"it is only fair then to go and help the other fellow." Each attendant is "rated" at the end of a six-month probationary period and annually thereafter. If the work of an attendant is unsatisfactory, the customary procedure is to notify the director of nurses, under whose general supervision attendants work; and, for unsatisfactory work, an attendant may be discharged.

Insisting that the "average" hospital attendant could and did perform, but that he (claimant) could not and did not handle, "various heavy jobs" such as mopping floors

or helping to restrain, lift or carry patients, claimant argues that he had not returned to "any employment" within the contemplation and meaning of those terms as used in the statutory definition of "total disability," i. e., "inability to return to any employment" [V.A.M.S. Sec. 287.020(8)], and that he was still totally disabled on December 13, 1961, the date of rehearing, as he had been on June 6, 1957, the date of the final award. In considering whether an individual is *totally* disabled under the statutory definition, our courts have said that "[w]hen we speak of the 'ability' or 'inability' of a person to obtain and hold employment, we ordinarily have in mind that the person referred to is either able or unable to perform the usual duties of whatever employment may be under consideration, in the manner that such duties are customarily performed by the average person engaged in such employment." Kinyon v. Kinyon, 230 Mo.App. 623, 629–630, 71 S.W.2d 78, 82; Maddux v. Kansas City Public Service Co., Mo.App., 111 S.W.2d 208, 212; Caldwell v. Melbourne Hotel Co., Mo.App., 116 S.W.2d 232, 238. See Groce v. Pyle, Mo.App., 315 S.W.2d 482, 490(6).

Witness Ball, a registered nurse and the director of nurses, testified that claimant's ratings placed him "in the middle of the average attendants," that no complaint concerning claimant's work had come to her, and that he was retained in his position for "his ability to perform the job" and for no other reason. Witness Young, a registered nurse and an evening supervisor under whom claimant had worked for about one year, characterized his work as "average" —"that's just about what everybody does," said that she "never had any complaint about him," and added the sage observation that "if you have people who don't work you soon hear about it from the other ones because nobody likes to do the other fellow's work." Witness Roberts, a "hospital attendant II" called to the stand by claimant's counsel, likewise had heard no complaint about claimant's work, was "sure it is the fact that he does his work" that kept

claimant on his job, and added emphatically that "if you would ever go out there you [would] know that you have to perform your work to stay out there."

We think that the foregoing will suffice to demonstrate that the Commission reasonably could have found (as it did) with respect to claimant's employment at the hospital: " * * * that he [claimant] entered such employment by virtue of a merit system examination and interview which had placed him on the register maintained for hospital attendants; * * * that said employee is and has been performing the ordinary, usual and customary duties incident to said employment and that he is and has been performing said duties in a satisfactory manner; that said employment is bona fide and not colorable; that vacancies in the type of employment engaged in by the employee are filled from those members of the open labor market who possess sufficient qualifications as to be placed on the register of the state merit system; that the employee received his employment and maintains the same on his own merits without assistance from considerations of friendship, sympathy or pressures; and *that the employee performs the duties of his employment in the manner such duties are customarily performed by the average person engaged in such employment.*" (Emphasis ours).

As claimant's counsel emphasize, there are disagreeable aspects to the work of a hospital attendant, particularly in an institution for the mentally retarded and epileptics, and this no doubt accounts in large measure for the comparatively rapid turnover in that category of employees. But it cannot be gainsaid that, in ministering to the physically and mentally afflicted, hospital attendants are engaged in an essential humanitarian labor. And, regardless of whether instant claimant actually considered his job to be a desirable one or whether he simply took it (as his counsel suggest) out of practical financial necessity, he did not obtain the job through a

relative's influence or hold it because others substantially performed the duties of his position, as was the situation in Kinyon v. Kinyon, supra, 230 Mo.App. loc. cit. 630, 71 S.W.2d loc. cit. 82, upon which claimant's counsel here rely. Nor could it be said that the relationship between claimant and the State of Missouri, his employer, was "brought about by a charitable hiring * * * through kindness or pity on the part of an employer" [Caldwell v. Melbourne Hotel Co., supra, 116 S.W.2d loc. cit. 239] or that claimant's work might be likened to that of a sidewalk vendor of pencils and shoestrings. Maddux v. Kansas City Public Service Co., supra, 111 S.W.2d loc. cit. 214. In short, we have no doubt but that claimant's work was an "employment" within the contemplation and meaning of the statutory definition of "total disability" [V.A.M.S. Sec. 287.020(8)] and that claimant was not, *at the time of rehearing on December 13, 1961*, totally disabled.

However, all of the foregoing still does not afford an adequate and complete answer to the question whether there had been a substantial change in claimant's condition between the date of the final award and the date of rehearing, i. e., between June 6, 1957, and December 13, 1961. For, if perchance the Commission erred in its finding of permanent total disability at the time of the final award, such error could not be corrected in this proceeding under V.A.M.S. Sec. 287.470 for rehearing on the ground of a change in condition. Brammer v. Binkley Mining Co. of Missouri, Mo.App., 244 S.W.2d 584, 588–589; Sei v. A. Guthrie & Co., Mo.App., 50 S.W. 2d 664, 666, certiorari quashed 332 Mo. 1061, 61 S.W.2d 950. In other words, an employer is not entitled to reduction in or termination of benefits payable under a final award simply upon a showing that the extent or duration of the employee's disability by reason of the condition existing at the time of the final award actually was less in extent or shorter in duration than the Commission then found and declared.

State ex rel. Sei v. Haid, supra, 332 Mo. loc. cit. 1070, 61 S.W.2d loc. cit. 954(7).

In arguing that there had been no substantial improvement in claimant's condition subsequent to the date of the final award, his counsel point out that, upon rehearing, Dr. O'Brien (the only orthopedic specialist who then testified) said that "there wasn't much change" in the right shoulder, that there was "no substantial difference" in the condition of the left foot, and that, since the right hip joint did not fuse, the intended result in that area had not been achieved, by reason of all of which the doctor still rated claimant's disability at 60% of the man as a whole, as he had done prior to the final award. It may be observed in passing that, at all times, Dr. O'Brien had regarded and rated claimant's disability as permanent *partial*, i. e., as "permanent in nature and partial in degree" [V.A.M.S. Sec. 287.190(5)], and *not* as permanent *total*, a rating in "extreme cases" [Kateman v. Zink, 238 Mo.App. 253, 264, 180 S.W.2d 253, 258] where it is shown that there will be permanent "inability to return to any employment and not merely * * * inability to return to the employment in which the employee was engaged at the time of the accident." V.A.M.S. Sec. 287.020(8). For that matter, Dr. H. R. McCarroll, an orthopedic surgeon in St. Louis selected by the trial referee to conduct an independent examination prior to the final award, likewise rated claimant's disability as permanent *partial*, to wit, as 75% of the man as a whole, *not* as permanent *total*. It is interesting to note also that, under the final award for permanent *total* disability, claimant had received prior to December 13, 1961, the date on which benefits were abated by the award on rehearing, the aggregate sum of $11,258.82 (i.e., $30 per week for 300 weeks from October 15, 1952, to July 15, 1958, inclusive, or the sum of $9,000, and thereafter $12.69 per week for 178 weeks from July 16, 1958, to December 12, 1961, inclusive, or the sum of $2,258.82), which was approximately 93.8% of the then maximum permissible

award of $12,000 (i.e., $30 per week for 400 weeks) for permanent *partial* disability. Sec. 287.190(2), RSMo 1949, as amended Laws of 1951, p. 621. But enough of this parenthetical comment, for the nature and extent of claimant's disability—a question of fact within the special province of the Commission [Barron v. Mississippi Lime Co. of Missouri, Mo.App., 285 S.W.2d 46, 48(1); Vollet v. Federal Brilliant Sign Co., Mo.App., 49 S.W.2d 201, 202]—was adjudicated by the unappealed final award and (as we have said), *if* the Commission then erred in its finding of permanent total disability, such error could not be corrected in this proceeding.

Returning to the record upon rehearing, we find other testimony by Dr. O'Brien, ignored in claimant's brief but indicative of significant change in claimant's physical condition. *Prior to the final award,* the "disuse atrophy" in the right thigh was such that its circumference was one and one-half inches *less* than that of the left thigh, whereas the lower right leg was so swollen that the circumference of the right calf was then one and one-half inches *greater* than that of the left calf. *At the time of rehearing,* the circumference of the right thigh was only one-half inch less than that of the left thigh evidencing muscular development of the right thigh and use of that leg, while the circumference of the right calf then was one-fourth inch less than that of the left calf reflecting the absence of swelling in the lower right leg. Cf. Kaiser v. H. C. Merry, Inc., Mo.App., 79 S.W.2d 474, 477. This testimony with respect to changes in the condition of the right thigh and leg becomes particularly meaningful when read in the light of the undoubted truth that the injury to claimant's right hip, which affected his ability to use his right leg, was (to borrow the language of claimant's counsel) "the most disabling of the various injuries sustained." Furthermore, there was no swelling in claimant's left foot at the time of rehearing, while there had been at the time of the final award.

Claimant's own testimony revealed changes in his physical condition. At hearings before the final award, claimant said that he walked with the aid of a cane and agreed with his counsel that he was unable "to walk for any distance satisfactorily." At the time of rehearing, he did not use a cane and admittedly walked from building to building on the hospital grounds, a distance estimated by him at "about half a block" but by witness Plank of the hospital personnel office at "approximately a quarter of a mile." At the time of the final award, claimant was "inclined to have a stiff neck all the time." At the time of rehearing, "the only time I take a stiff neck is if I take a cold." Although categorically denying that his condition had improved, he did concede upon rehearing that he "might have gained a little strength."

■ Upon rehearing, the Commission also had before it the testimony of several lay witnesses concerning claimant's activities at the hospital over a period of more than twenty-five months, which [wholly aside from the statutory definition of "total disability" in V.A.M.S. Sec. 287.020 (8)] would have permitted the finding that claimant's disability at the time of rehearing on December 13, 1961, was *not total.* On the other hand, the evidence . taken at hearings prior to the final award of June 6, 1957, persuasively demonstrated that claimant's disability *then* was (as the Commission found) *total.* (Whether that evidence justified the *then* finding of *permanent* total disability is a debatable question without the scope of this appellate review.) Numerous Missouri cases manifest the significance which has been accorded to the testimony of lay witnesses, particularly when supported by *some* medical evidence. E. g., Slider v. Brown Shoe Co., supra, 308 S.W.2d loc. cit. 310, and cases there cited. So, in determining whether there had been a substantial change in the condition of instant claimant, the Commission was not required to ignore the plain facts concerning his employment and the lay testimony with respect to his activities at the hospi-

tal. Kateman v. Zink, supra, 238 Mo.App. loc. cit. 264–265, 180 S.W.2d loc. cit. 258–259; Valentine v. General Paper Stock Co., Mo.App., 37 S.W.2d 457. See also Starchman v. Kansas Explorations, Mo.App., 225 S.W.2d 354.

Mindful that it is for the Commission, as trier of the facts, to draw from the evidence such inferences as reasonably may be permissible [Barton v. Western Fireproofing Co., supra, 326 S.W.2d loc. cit. 349(6)], and that our inquiry is whether the findings and award of the Commission are supported by competent and substantial evidence upon the whole record, *not* whether a contrary award would have found such support [Gregory v. Lewis Sales Co., Mo.App., 348 S.W.2d 743, 747], we are constrained to conclude that the award on rehearing abating benefits for permanent total disability as of December 13, 1961, should be affirmed. It is so ordered.

RUARK, P. J., and HOGAN, J., concur.